# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA
_____

Darlene A. Konz,                              Civ. No. 08-5003 (DSD/JJK)

       Plaintiff,

v.

Michael J. Astrue,
Commissioner of the Social        **REPORT AND RECOMMENDATION**
Security Administration,

       Defendant.


_____

John H. Burns, Esq., Attorney at Law, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.
_____

JEFFREY J. KEYES, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Darlene A. Konz seeks judicial

review of the final decision of the Commissioner of Social Security ("the

Commissioner"), who denied Plaintiff's application for disability insurance

benefits. This matter is before this Court for a Report and Recommendation to

the District Court on the parties' cross-motions for summary judgment. *See* 28

U.S.C. § 636(c); D. Minn. Loc. R. 72.1. For the reasons stated below, this Court

recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 7), be

denied, and that Defendant's Motion for Summary Judgment (Doc. No. 9), be

granted.

**BACKGROUND**

## I.    Procedural History

Plaintiff filed an application for disability insurance benefits in August 2003, alleging a disability onset date of June 4, 2002.  (Tr. 173-76.)[1]  The application was denied initially and on reconsideration.  (Tr. 63-66.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on March 28, 2005.  (Tr. 654-721.)  At the hearing, Plaintiff amended her onset of disability date to May 1, 2003.  (Tr. 658-59.)[2]  On August 5, 2005, the ALJ issued an unfavorable decision.  (Tr. 67-77.)  Plaintiff filed a new application for disability insurance benefits on August 11, 2005.  (Tr. 78.)  The Social Security Administration granted her application, finding her disabled beginning August 13, 2005.  (*Id.*)

Plaintiff then sought review by the Appeals Council of the ALJ's August 5, 2005 unfavorable decision.  (Tr. 86-87.)  The Appeals Council vacated the ALJ's decision and remanded on the issue of disability prior to August 13, 2005.  (Tr. 78.)  The Appeals Council ordered that on remand the ALJ obtain evidence from a medical expert, hold a new hearing, reevaluate Plaintiff's alleged mental

---

[1]    Throughout this Report and Recommendation, reference to the administrative transcript for the present case, Civ. No. 08-5003, is made by using the abbreviation "Tr."

[2]    To qualify for disability insurance benefits, a claimant must establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).  Plaintiff's insurance coverage expired on December 31, 2006.  (Tr. 68.)

impairments and residual functional capacity, and obtain supplemental evidence from a vocational expert. (Tr. 79-80.) The Appeals Council also affirmed the favorable decision on Plaintiff's subsequent claim, finding Plaintiff disabled beginning August 13, 2005. (Tr. 78.)

The second administrative hearing was held before an ALJ on November 29, 2006. (Tr. 722-98.) On September 7, 2007, the ALJ issued an unfavorable decision. (Tr. 16-46.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on June 26, 2008. (Tr. 7-11.) The ALJ's September 7, 2007 decision therefore became the final decision of the Commissioner with respect to Plaintiff's August 2003 application. *See* 20 C.F.R. § 404.981. On August 22, 2008, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). The parties thereafter filed cross-motions for summary judgment. *See* D.Minn. Loc. R. 7.2.

## II. Factual Background and Medical History

Plaintiff was born on April 21, 1950, and graduated from high school. (Tr. 21, 173.) At the time of the second administrative hearing, she was 56 years old. (Tr. 729.) She has past relevant work as an electronics assembler and electronics inspector at a light, semi-skilled level; a department manager at a medium, skilled level; a resident care aid at a medium, skilled level; a deli-cutter-slicer at a light, unskilled level; a receptionist at a sedentary, semi-skilled level; a teacher aide at a light, semi-skilled level; and a solder-machine operator at a light, unskilled level. (Tr. 224.) In 2001, Plaintiff was laid off from her job as a

machine operator.  (Tr. 263, 736-37.)  Her employer provided her with two years
of vocational training in computer repair, which she completed in May 2003.
(Tr. 730-31)  Plaintiff testified that she was never able to work in her new
vocation because of her pain, fatigue, and trouble with concentration.  (Tr. 733,
749.)

In her Disability Report to the Social Security Administration, Plaintiff
alleged the following conditions that limited her ability to work: neck swelling;
possible pinched nerve in the neck; thyroid problems; right shoulder pain; right
arm numbness and loss of strength; knee and leg swelling; and osteoarthritis.
(Tr. 180.)  In her Disability Report on Appeal, Plaintiff noted the following
additional conditions: low back pain; carpal tunnel syndrome; depression; sleep
apnea; and spinal disc disease in the cervical and lumbar spine.  (Tr. 218-19.)

In 2000, before her alleged onset of disability, Plaintiff was treated several
times at Prairie Family Practice for fatigue, lower-lumbar pain, intermittent
headaches, tingling in her extremities, myalgias, depression, vertigo, and
lightheadedness.  (Tr. 226, 228-29, 234-35, 349.)  All testing returned normal
results, except that Plaintiff had a high triglyceride level.  (Tr. 226, 228-29, 234-
35, 349.)  Plaintiff was seen by Dr. Andrew Chang at Affiliated Community
Medical Centers on September 1, 2000, in follow up for her headaches and for
the new symptom of numbness in the right lower extremity.  (Tr. 344-45.)
Plaintiff reported that her headaches had largely resolved and were only a mild
annoyance from time to time.  (Tr. 344.)  Dr. Chang opined that Plaintiff's knee

4

symptoms would be most consistent with peripheral polyneuropathy, for which he would order a complete screen.  (*Id.*)  Plaintiff's neurological examination was normal.  (Tr. 345.)

Over a year and a half later, in June 2002, Plaintiff saw Dr. Patricia D'Aquila at Affiliated Community Medical Centers.  (Tr. 337-39.)  Plaintiff complained of back pain on the left side.  (Tr. 339.)  Plaintiff stated that her back was fine if she sat still or after standing up, but that she experienced pain when she leaned forward to get up.  (*Id.*)  This was in the context of Plaintiff doing inventory where she had to get down on her knees or lay on her back to read serial numbers on equipment.  (*Id.*)  Dr. D'Aquila opined that Plaintiff's symptoms were suggestive of musculoskeletal back pain, and gave Plaintiff some samples of Vioxx.  (Tr. 338.)

On June 17, 2002, Plaintiff saw Dr. Gabrielle Vencel Olson at Affiliated Community Medical Centers, with complaints of low back pain, fatigue, numbness in the right arm, diarrhea, gas, tingling, insomnia, and headaches.  (Tr. 337.)  Plaintiff's physical examination was normal.  (Tr. 335.)  Dr. Vencel Olson scheduled a number of tests to evaluate Plaintiff's fatigue, and referred Plaintiff for a colonoscopy.  (Tr. 335.)  Plaintiff had a colonoscopy on June 28, 2002, which revealed diverticulosis.  (Tr. 243.)

On June 25, 2002, Plaintiff saw Dr. Vencel Olson again.  He noted that Plaintiff was severely hypothyroid at her last visit, and that he had started her on Synthroid, which she was now reporting improved her fatigue.  (Tr. 333.)  Plaintiff

complained of left lower extremity edema and left-sided neck and jaw pain.  (*Id.*)

On examination, Plaintiff had mild bilateral pedal edema, which Dr. Vencel Olson

recommended treating with Lasix.  (Tr. 332.)

On July 26, 2002, Plaintiff saw Dr. Vencel Olson for follow-up on her

hypothyroidism.  (Tr. 330.)  Plaintiff reported that she was concerned about her

right eyelid sagging, having total body right-sided numbness, and having a

sensation of ear fullness.  (*Id.*)  Dr. Vencel Olson noted that Plaintiff had

hyperlipidemia with severely elevated LDL, low HDL, and elevated triglycerides.

(Tr. 329.)  He ordered an echocardiogram and an MRI of the brain to rule out

cerebral ischemia.  (*Id.*)  The CT and MRI scans of Plaintiff's brain on July 26 and

July 31, 2002, were normal.  (Tr. 412-13.)  Plaintiff had an echocardiogram and a

carotid ultrasound on July 31, 2002.  (Tr. 405-06.)  The results from these tests

were also normal.  (*Id.*)

On August 21, 2002, Plaintiff complained to Dr. Vencel Olson of right

eyelid swelling and blurry vision.  (Tr. 328).  Plaintiff was referred to

Ophthalmologist Katherine Shin, who diagnosed Plaintiff with variable ptosis,[3]

sutural cataracts of each eye, which were not visually significant, and

---

[3]     Ptosis means the sinking down of an organ.  *Stedman's Medical Dictionary*
1481 (Lippincott Williams & Wilkins 27th ed. 2000).

dermatochalasis[4] of each eyelid.  (Tr. 249-50, 326.)  Plaintiff was not interested in surgery for dermatochalasis at that time.  (Tr. 249.)

On September 9, 2002, Plaintiff saw Dr. Chang and reported that the numbness in her right arm and leg started when she began taking aspirin and thyroid medication at the same time.  (Tr. 322-24.)  Dr. Chang started Plaintiff on Plavix, an anti-platelet agent, to treat her "complaints of subjective numbness in the right arm and the right leg[.]"  (Tr. 322.)  Plaintiff followed up with Dr. Chang on October 21, 2002, and Dr. Chang noted that the previous MRI of Plaintiff's brain showed scattered white matter disease, which he doubted was the cause of her symptoms.  (Tr. 319-20.)  Dr. Chang noted that he had recommended that Plaintiff add Plavix to her aspirin, but that she had not done this.  (Tr. 319.)  Dr. Chang explained that her studies had not shown conclusive evidence of a stroke affecting Plaintiff's left brain, but that with her symptoms, this would be a concern.  (*Id.*)  He encouraged Plaintiff to start on Plavix.  (*Id.*)

On November 6, 2002, Plaintiff went to Urgent Care when she felt a popping/ripping sensation with subsequent pain in her left knee.  (Tr. 317.)  Plaintiff was given a knee immobilizer.  (*Id.*)  A week later, Plaintiff followed-up with Dr. D'Aquila and reported that she could walk without the immobilizer.  (Tr. 316.)  Dr. D'Aquila recommended continued use of Advil and use of an Ace bandage.  (*Id.*)

---

[4]     Dermatochalasis is a condition characterized by deficient elastic fibers of the skin, which may hang in folds.  *Stedman's Medical Dictionary* 480 (Lippincott Williams & Wilkins 27th ed. 2000).

On November 12, 2002, Plaintiff saw an endocrinologist, Dr. Rowan DeBold, regarding her thyroid.  (Tr. 313-15.)  Plaintiff's examination was normal, and Dr. DeBold could not confirm that hypothyroidism caused Plaintiff's symptoms of swelling in her eye, leg, and knee, and numbness in her face, right arm, and right leg.  (*Id.*)

On May 16, 2003, about two weeks after Plaintiff's amended onset of disability date, Plaintiff saw Dr. Joann Neubauer at Affiliated Community Medical Center to have her thyroid rechecked and for evaluation of her left knee, which was still causing pain and swelling.  (Tr. 307-08.)  Plaintiff also complained of throbbing pain over the right flank.  (Tr. 308.)  Dr. Neubauer ordered an MRI of Plaintiff's knee, which revealed a moderately large joint effusion, moderately severe focal chondromalacia, and prominent degenerative change within the medial meniscus, with possible small tear of the medial meniscus.  (Tr. 307, 393.)  Plaintiff also had an ultrasound of her kidneys for evaluation of her right flank pain.  (Tr. 394.)  The results from the ultrasound were normal.  (*Id.*)  Plaintiff was scheduled for left knee arthroscopy in June 2003, but she canceled two days prior.  (Tr. 306.)

In July 2003, Plaintiff was referred to Dr. Edwin Harrington at the Orthopaedic and Fracture Clinic in Redwood Falls, Minnesota, for evaluation of her knee pain.  (Tr. 257.)  Dr. Harrington noted that Plaintiff was a student, and also worked on a farm tending sheep.  (Tr. 257.)  Plaintiff reported that her knee pain and swelling had been getting worse since she injured it on November 6,

2002.  (*Id.*)  On examination, Dr. Harrington noted that Plaintiff was obese and walked with a slight antalgic gait on the left.  (*Id.*)  After reviewing Plaintiff's MRI results from May 2003, Dr. Harrington opined that her knee pain was most consistent with medial osteoarthritis.  (*Id.*)  Dr. Harrington gave Plaintiff a cortisone injection in her knee.  (*Id.*)  When Plaintiff was seen for follow-up approximately two weeks later, her knee was much improved.  (Tr. 256.)

On July 15, 2003, Plaintiff had X-rays of her cervical and lumbar spine and chest.  (Tr. 376.)  The X-ray of her lumbar spine indicated degenerative changes with varying amounts of disc space narrowing, reactive sclerosis, osteophyte formation, and degenerative facet changes.  (Tr. 376.)  The X-ray of her cervical spine indicated degenerative changes with disc space narrowing predominantly at C5-6, and to a lesser degree at C4-5.  (*Id.*)  The X-ray of Plaintiff's chest was normal.  (*Id.*)

Also in July 2003, Dr. Neubauer referred Plaintiff to physical therapy for the shooting pain and numbness she experienced in her right upper extremity, her lower-cervical tenderness, and low back pain.  (Tr. 303.)  On July 18, 2003, Plaintiff's physical therapist, Kristi Quitney, noted that Plaintiff was very active with lawn and garden upkeep at her farm.  (*Id.*)  Quitney noted that Plaintiff had just finished school and was looking for employment but was concerned about how her symptoms would affect her work.  (*Id.*)  Quitney recommended that Plaintiff minimize prolonged sitting, avoid overhead activities, and attend physical therapy two or three times a week.  (Tr. 302.)

After three sessions of physical therapy, Plaintiff complained to her therapist of increased cervical pain. (Tr. 299.) Plaintiff reported that she did not notice any decrease in the tingling and numbness of her right arm and hand. (*Id.*) About a week later, on July 30, 2003, Plaintiff saw Dr. Neubauer for numbness and pain in the right arm and hand. (Tr. 297.) Plaintiff reported that she was having difficulty applying for work because any lifting caused excruciating pain to her hand. (Tr. 296-97.) Dr. Neubauer noted the possibility of carpal tunnel in the right hand. (Tr. 296.)

Approximately one month later, Plaintiff saw a neurologist, Dr. Mark Larkins, who ordered an MRI of Plaintiff's cervical spine, and a right arm EMG. (Tr. 294-95.) The MRI of Plaintiff's cervical spine was taken on September 10, 2003, and showed mild effacement across the ventral thecal sac at C5-6, which appeared to represent a combination of broad-based bulging disc and small hypertrophic spurs, with no evidence of cord displacement or cord compression. (Tr. 372.) Plaintiff also had an EMG, which was negative. (Tr. 293.)

On September 18, 2003, Plaintiff saw Dr. Neubauer and complained of right shoulder spasms and swelling, pain and numbness in her right hand, headache, and difficulty with her knees. (Tr. 288.) Plaintiff reported that her family members were noticing that she was despondent because of her condition. (*Id.*) On examination, Plaintiff had slightly decreased grip strength, and significant tenderness over the shoulder, forearm, and posterior neck area. (*Id.*) Dr. Neubauer increased Plaintiff's Naprosyn, prescribed Neurontin and

Nortriptyline, and changed Plaintiff's physical therapy to incorporate ultrasound and stimulation therapy. (*Id.*)

Plaintiff saw Dr. Neubauer again on October 23, 2003, and related that she was concerned about vinyl chloride in her water. (Tr. 279.) Dr. Neubauer noted that vinyl chloride exposure can lead to a lupus-like inflammatory reaction, and she prescribed Prednisone. (Tr. 278.) A week later, Plaintiff reported that the Prednisone was helping with the pain in her knees. (Tr. 282.) Plaintiff had also been seeing a new physical therapist but was discharged from physical therapy on November 4, 2003, after she failed to return for any appointments after her October 1, 2003 session. (Tr. 287.)

On November 14, 2003, Dr. Charles Grant completed a physical Residual Functional Capacity ("RFC") assessment for Plaintiff at the request of the Social Security Administration. (Tr. 475-85.) He opined that although Plaintiff had a long history of pain, weakness, and parasthesias in the upper extremities, the medical records indicated her physical exam was unremarkable, and an MRI of her cervical spine showed a bulging disc without nerve compression. (Tr. 476-77.) Dr. Grant also noted that Plaintiff's EMG of the right upper extremity was negative for neuropathy or radiculopathy. (Tr. 477.) Dr. Grant noted that Plaintiff was obese, and her hypothyroidism, as treated, was non-severe. (*Id.*) Dr. Grant

concluded that Plaintiff's alleged symptoms exceeded the objective findings, but they reduced Plaintiff's RFC to medium exertional level work.  (Tr. 477.)[5]

On December 3, 2003, Plaintiff established care with Dr. Richard Rasmussen at Affiliated Community Medical Centers.  (Tr. 274.)  She complained of neck pain and headaches, which had improved at the time of the appointment.  (*Id.*)  Plaintiff reported that she was concerned that she might be vinyl-chloride toxic.  (*Id.*)  On examination, Dr. Rasmussen noted some paracervical muscle spasm, which he thought to be the cause of her headaches, and he prescribed Flexeril.  (*Id.*)  Dr. Rasmussen did not see any evidence that Plaintiff had neurological problems.  (*Id.*)

A week later, Plaintiff saw Dr. William Brunell at Regions Hospital for evaluation of multiple medical problems that Plaintiff felt were related to vinyl-chloride exposure from well water at her home.  (Tr. 262.)  Plaintiff reported that her symptoms began in 1989, and Dr. Brunell noted that her entire symptom list was too long to include in a dictation, but included fatigue, headache, numbness, intermittent chills, and dizziness.  (*Id.*)

Plaintiff also reported that she was laid off from her job in 2001.  (Tr. 263.)  Through part of her severance package, she was trained for two years to perform computer maintenance and repair, but she never worked in that field due to

---

[5]     At the request of the Social Security Administration, Dr. Mark Aaron reviewed Plaintiff's additional medical records.  On March 24, 2004, he affirmed Dr. Grant's opinion.  (Tr. 482-83.)

worsening symptoms.  (*Id.*)  Plaintiff reported that she lived alone, but her son

stayed with her for short periods of time.  (Tr. 264.)  Although she had farm

animals on her property at one time, Plaintiff reported that she could no longer

care for livestock.  (*Id.*)

Dr. Brunell found Plaintiff's examination normal, and concluded that it was

unlikely that Plaintiff's symptoms were caused by vinyl-chloride exposure.  (*Id.*)

Dr. Brunell noted that Plaintiff's water tested at one part per billion vinyl chloride,

and although the EPA recommends a level of zero, the maximum tolerated level

was two parts per billion.  (Tr. 263-64.)  Dr. Brunell concluded:

> The patient has been active throughout her life and has been caring
> for herself, both in terms of having a job and performing her usual
> activities of daily living and since her job loss in 2001, and her
> retraining in a completely new field of expertise, she has had
> increasing symptoms that have kept her from the workplace.  It may
> be of benefit for this patient to follow-up with her primary care
> physician and discuss the possibility of psychological or psychiatric
> evaluation as a next step in trying to determine this patient's
> underlying causes for her symptoms.

(Tr. 264.)

On January 6, 2004, Plaintiff saw Dr. Neubauer and complained of right-

sided pain, shortness of breath, and achiness all over.  (Tr. 270.)  Plaintiff was

also concerned about a cyst in her liver.  (*Id.*)  Dr. Neubauer ordered pulmonary

function and liver function studies.  (Tr. 269, 357.)  Plaintiff also had an

abdominal ultrasound, which showed a simple hepatic cyst unchanged from May

16, 2003.  (Tr. 359.)  Dr. Neubauer diagnosed chronic obstructive pulmonary

disease ("COPD") and hypoxemia.[6]  (Tr. 268.)  On January 21, 2004,

Dr. Neubauer noted that Plaintiff was convinced she had liver cancer and wanted

to go to Mayo Clinic for evaluation.  (Tr. 269.)

Plaintiff was evaluated by a series of doctors at Mayo Clinic, beginning

with Dr. Kevin Fleming in General Internal Medicine on February 27, 2004.

(Tr. 458.)  Plaintiff reported that over a number of years she had symptoms of

dizzy spells, memory problems, and a sleep problem.  (*Id.*)  She reported that

she was found to be hypothyroid in 2002, and at the same time, her dog and

sheep were found to have thyroid disorders.  (*Id.*)  She also reported having

"neurological" problems of knee pain, shooting leg pains, and right upper-

extremity numbness.  (*Id.*)  She explained that she then had her home tested for

exposures, and a slightly elevated level of vinyl chloride was found in her well

water.  (*Id.*)

Plaintiff reported that her dizzy spells started about six months prior to the

diagnosis of her thyroid disorder, and when she had a dizzy spell, her vision

blurred.  (*Id.*)  She also reported difficulty with her memory dating well before the

diagnosis of thyroid disorder.  (Tr. 458.)  Plaintiff reported that her symptoms of

knee, leg, and right eye swelling started after she was diagnosed with

hypothyroidism.  (Tr. 459.)  She also reported nonrestorative sleep, which

caused her to need a three-hour nap during the day.  (*Id.*)  Dr. Fleming noted at

---

[6]     Hypoxemia is subnormal oxygenation of arterial blood.  *Stedman's Medical Dictionary* 867 (Lippincott Williams & Wilkins 27th ed. 2000).

that time that Plaintiff had the following conditions:  (1) elevated transaminases,[7] for which he recommended additional testing; (2) peripheral edema, for which he recommended vascular testing, CT scans of the abdomen and pelvis, and echocardiogram; (3) bilateral knee osteoarthritis with left knee swelling; (4) cognitive complaints and arm/hand numbness, for which he recommended repeat EMG and neurology consultation; and (5) carbon monoxide elevation, for which he recommended a CT scan of the chest and pulmonary-function studies. (Tr. 460-61.)

Plaintiff was next evaluated by Dr. Suzanne Skoog in Gasteroenterology and Hepatology at Mayo Clinic on March 2, 2004.  (Tr. 455.)  Dr. Skoog noted that Plaintiff's evaluation for chronic liver disease was unremarkable, but her lipid profile showed a triglyceride level of 240.  (*Id.*)  Plaintiff reported some right-sided rib pain beginning around the time she was told her liver enzymes were elevated. (*Id.*)  Dr. Skoog noted that Plaintiff's abnormal liver tests were in the setting of obesity and hyperlipidemia, and she recommended weight reduction and repeat liver tests in four to six months, but no further testing.  (Tr. 456-57.)  Dr. Jayant Talwalker, also a physician in the Mayo Clinic Gasteroenterology and Hepatology Department, agreed with Dr. Skoog's findings and summary, and noted that Plaintiff had elevated serum liver biochemistries, an elevated serum triglyceride

---

[7]     Transaminases, a synonym for aminotransferases, are enzymes that transfer amino groups.  *Stedman's Medical Dictionary* 59 (Lippincott Williams & Wilkins 27th ed. 2000).

level, elevated BMI, and CT scan findings consistent with nonalcoholic fatty liver disease.  (Tr. 454.)

On March 3, 2004, Plaintiff saw Dr. Charles Bolton and Dr. Su J. Choi in Neurology at Mayo Clinic for evaluation of her memory loss.  (Tr. 448-51.) Dr. Bolton noted, "[s]he gives a clearcut history of mental depression on careful questioning."  Plaintiff's neurological and mini-mental-status examinations were entirely normal.  (Tr. 451.)  Dr. Bolton opined that Plaintiff's mild memory loss was "on the basis of mental depression."  (*Id.*)  He noted that the changes in the MRI of her brain were due to small vessel ischemic changes and were of no clinical significance.  (*Id.*)  Dr. Bolton also opined that the intermittent symptoms in Plaintiff's right hand were due to mild carpal tunnel syndrome, as demonstrated by EMG, but surgery was not indicated.  (*Id.*)  Dr. Bolton recommended that Plaintiff wear a hand and wrist splint at night to relieve her symptoms.  (*Id.*)  He also recommended treatment for depression, treatment for nicotine dependence, and physical therapy to increase exercise tolerance for chronic fatigue.  (Tr. 450.)

The next day, Plaintiff saw Dr. Bryan Krajicek in Pulmonary and Critical Care Medicine at Mayo Clinic.  (Tr. 445.)  Dr. Krajicek informed Plaintiff that her elevated carbon monoxide levels were caused by her cigarette smoking. (Tr. 446.)  Dr. Jay H. Ryu, also a physician in Pulmonary and Critical Care Medicine at Mayo Clinic, agreed with Dr. Krajicek's findings.  (Tr. 444.)  Plaintiff had an appointment at the Nicotine Dependence Center later that day.  (Tr. 446.)

Next, Plaintiff underwent a neuropsychological assessment with Dr. Mary Machulda at Mayo Clinic on March 5, 2004. (Tr. 441-43.) Dr. Machulda noted that Plaintiff started seeing a social worker in the last few weeks. (Tr. 442.) Upon psychometric testing, Plaintiff's verbal and nonverbal intellectual abilities were average, and Plaintiff's working memory and processing speed were also average. (Tr. 443.) Plaintiff's score on the Beck Depression Inventory was also within normal limits. (*Id.*) Dr. Machulda opined:

> This profile is essentially within normal limits. It does not indicate any significant cognitive problem, nor does it suggest any neurologic condition affecting cognition. There are two isolated low average performances, but these could simply represent normal variation.

(*Id.*)

On March 9, 2004, Plaintiff was evaluated for lower-extremity edema by Dr. Raymond C. Shields at the Mayo Clinic Vascular Center. (Tr. 431-33.) Dr. Shields noted that Plaintiff's lower-extremity-venous studies from February 27, 2004, demonstrated superficial venous incompetence with no evidence of deep-vein obstruction or incompetence. (Tr. 432.) Dr. Shields opined that Plaintiff's bilateral lower-extremity edema was probably multifactorial, and contributing factors might include lipedema, edema associated with hypothyroidism, increased weight, superficial venous incompetence, and elevated pulmonary arterial pressures. (*Id.*) Dr. Shields recommended that Plaintiff try water aerobics. (*Id.*)

Plaintiff followed-up with Dr. Fleming later that day.  (Tr. 429-30.)

Dr. Fleming noted Plaintiff's diagnoses were: (1) elevated transaminases,

nonalcoholic fatty liver disease; (2) peripheral edema; (3) bilateral knee

osteoporosis with left knee swelling; (4) cognitive complaints, no evidence of

multiple sclerosis; (5) MRI changes consistent with small vessel ischemic

disease; (6) carpal tunnel syndrome, right hand; (7) depression; (8) carbon

monoxide elevation; (9) mild COPD due to tobacco abuse; and (10) possible

sleep apnea.  (Tr. 430.)

On March 17, 2004, Plaintiff underwent overnight oximetry[8] testing at

Mayo Clinic.  (Tr. 426.)  Dr. Eric Olson noted that the test results suggested the

possibility of position and/or sleep stage dependent disordered breathing.

(Tr. 427.)  Plaintiff then had an overnight sleep study test and was found to have

mild obstructive sleep apnea, although Dr. Olson noted the study may have

underestimated the severity because Plaintiff's sleep efficiency was poor and her

REM-stage sleep was minimal.  (Tr. 424.)  Dr. Olson recommended a CPAP trial,

and Plaintiff agreed.  (Tr. 424-25.)

On March 24, 2004, Dr. Dan Larson completed a Psychiatric Review

Technique Form and Mental Residual Functional Capacity Form for Plaintiff at

the request of the Social Security Administration.  (Tr. 487-501.)  Dr. Larson

---

[8]     Oximetry is a procedure that tests oxygen saturation by fluctuations of light
absorption in well-vascularized tissue.  *Stedman's Medical Dictionary* 1292
(Lippincott Williams & Wilkins 27th ed. 2000).

concluded that the clinical data supported mild depression, but that Plaintiff's mental impairment was non-severe.  (Tr. 501.)

On May 7, 2004, Plaintiff saw Dr. Rasmussen again.  (Tr. 562-63.) Dr. Rasmussen noted that Plaintiff recently had a very extensive work-up at Mayo Clinic, and that Plaintiff reported she would like to go back to work. (Tr. 563.)  Plaintiff, however, complained of chronic low back pain and generalized stiffness.  (*Id.*)  Dr. Rasmussen noted that Plaintiff could walk a half mile each way on her driveway without difficulty breathing, and recommended that Plaintiff begin a work flexibility program with physical therapy to increase her physical activity so she could return to work.  (Tr. 562.)  Later that month, Dr. Rasmussen encouraged Plaintiff to try to go back to work soon.  (Tr. 557-58.) One month after that, Dr. Rasmussen opined that Plaintiff's inactivity made things considerably worse.  (Tr. 552.)

On June 2, 2004, Plaintiff underwent a psychological assessment with licensed social worker Laurie Klawitter at Woodland Centers.  (Tr. 527-28.) Klawitter noted that Plaintiff had little motivation, and her mood was sad, empty, and anxious.  (Tr. 527.)  Plaintiff reported having two grown children, a son and a daughter, and two marriages that ended in divorce.  (*Id.*)  Klawitter diagnosed Plaintiff with adjustment disorder with mixed emotions, and a GAF score of 50.[9]

---

[9]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000)

(Tr. 528.)  Klawitter noted that Plaintiff had a negative reaction to Zoloft, and had recently started taking Lexapro.  (Tr. 526.)  A week later, Klawitter noted that Plaintiff vented her worries and frustrations about "her [well] water situation at home potentially related medical problems and the lack of concern and follow through from both MDs and environmental personnel."  (Tr. 525.)  Plaintiff worried about being helpless, dependent, and eventually homeless.  (*Id.*)

On June 9, 2004, Plaintiff's physical therapist noted that Plaintiff tolerated and performed exercises well, but her symptoms did not improve.  (Tr. 555.)  Plaintiff reported that she sat for three to four hours in front of a computer, but that she had to change position frequently.  (*Id.*)  Plaintiff also reported that she walked to her barn or to her grove to pick asparagus.  (*Id.*)  Two days later, Plaintiff's physical therapy was discontinued with no improvement in her low back after seven treatments.  (Tr. 554.)  Plaintiff's physical therapist recommended that she see a low back specialist.  (Tr. 552, 554.)

In a session with social worker Klawitter on June 16, 2004, Plaintiff reported her continued contacts to health and environmental agencies to get further testing.  (Tr. 524.)  Plaintiff reported that her family was supportive, but worried that she would become overwhelmed by anxiety and break down like two of her siblings who became delusional.  (*Id.*)  Klawitter noted that Plaintiff's

---

("DSM-IV-TR")).  A GAF score of  21-30 indicates inability to function in almost all areas, a score of 31-40 indicates major impairment in several areas of functioning, a score of 41-50 indicates any serious impairment in social, occupational, or school functioning, and a score of 51-60 indicates moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 32.

thought processes appeared undisturbed and there were no apparent signs of delusions.  (*Id.*)

At her next therapy session, Plaintiff reported that she continued to work with geologists and a variety of specialists for her well-water issue.  (Tr. 523.) Plaintiff's mood appeared brighter, but she complained of continued fatigue during the day.  (*Id.*)  In the following session, Plaintiff reported feeling vulnerable and dependent due to her chronic medical problems.  (Tr. 522.)

On July 23, 2004, Plaintiff saw Dr. Richard Salib at the Institute for Low Back and Neck Care for her complaints of low back pain and intermittent loss of bladder control.  (Tr. 534.)  Dr. Salib ordered an MRI of Plaintiff's lumbar spine, and at Plaintiff's request also ordered an MRI of her cervical spine.  (Tr. 534-35, 537.)  The MRI of Plaintiff's lumbar spine indicated multiple level minimal disc bulges with no disc herniation or central stenosis, a mild decrease of the neural foramen at L4-5, and facet arthropathy.  (Tr. 537.)  Dr. Salib opined that these findings did not explain Plaintiff's intermittent loss of bladder control.  (Tr. 533.)

The MRI of Plaintiff's cervical spine indicated a broad-based disc bulge at C5-6 with peridiscal spurring and joint arthropathy, marked decrease of both neural foramen at C5-6 from joint arthropathy and spurring, moderate decrease of both neural foramen at C6-7, and mild decrease of the right C7-T1 foramen from joint arthropathy.  (Tr. 536.)  Dr. Salib recommended that Plaintiff be evaluated by others at his clinic to determine whether the findings from the MRI of her cervical spine could be related to her arm numbness, tingling, and chronic

neck pain.  (Tr. 533.)  Dr. Salib concluded that Plaintiff was not a good candidate for surgery on her lumbar spine because her MRI did not show enough pathology to consider surgery.  (Tr. 532.)  Dr. Salib recommended treatment with acupuncture and nerve blocks because physical therapy had only aggravated Plaintiff's symptoms.  (*Id.*)  On August 4, 2004, Plaintiff reported some improvement in her back pain to Dr. Rasmussen.  (Tr. 549-50.)

On August 12, 2004, Plaintiff underwent a psychiatric consultation with Dr. David Kerski at Woodland Centers.  (Tr. 517-20.)  On mental-status examination, Plaintiff was alert and oriented, and did not appear overtly depressed.  (Tr. 519.)  Dr. Kerski had a clear sense that Plaintiff did not understand her medical problems or understand that it was her smoking that caused COPD, not vinyl chloride.  (*Id.*)  Dr. Kerski diagnosed major depression single episode, and a GAF score of 50.  (*Id.*)  He opined that Plaintiff had a very somatic approach to her problems (i.e. embodied neuroses), and he wondered if anxiety or depression could explain some of her medical problems, although she was hyperthyroid and had some liver function problems.  (*Id.*)  Plaintiff reported feeling significant improvement from taking Lexapro and felt worse after it was discontinued.  (*Id.*)  Dr. Kerski stated that he would contact Plaintiff's insurance company to try to get coverage for Lexapro.  (Tr. 520.)

Plaintiff's mood improved after restarting antidepressants, but she still complained of pain interfering with her daily tasks.  (Tr. 516.)  At her next therapy session on September 1, 2004, Plaintiff related that her mood improved at times

depending on her energy and pain levels. (Tr. 515.) Plaintiff was tearful when discussing her helplessness and inability to work. (*Id.*)

On September 14, 2004, Plaintiff saw Dr. Rasmussen and brought a report showing that her well water contained tetrahydrofuran. (Tr. 546.) Dr. Rasmussen recommended that she drink bottled water. (*Id.*) Plaintiff also reported that her use of Lexapro was going reasonably well, but that she had continued back pain, occasional right-flank pain, and occasional left-biceps pain. (*Id.*) Plaintiff reported that she did not feel she could go back to work. (Tr. 545.) Dr. Rasmussen recommended that Plaintiff see a psychiatrist who might have some suggestions on what to do to get Plaintiff back to work. (*Id.*)

Dr. Rasmussen referred Plaintiff to Dr. Patrick Retterath at Affiliated Community Medical Centers for evaluation of her chronic back and neck pain. (*Id.*) On September 20, 2004, Plaintiff saw Dr. Retterath. (Tr. 543-45.) Plaintiff rated her pain as a level six out of ten at rest, and eight out of ten with activity. (Tr. 544.) Dr. Retterath noted that Plaintiff could not sit in one position for very long and had to move around to relieve back pain, but she ambulated with a normal gait. (*Id.*) On examination, Plaintiff was tender throughout her low back, and toe-walked with difficulty. (*Id.*) Plaintiff had good strength and balance, but her reflexes were slightly reduced. (*Id.*) Although steroids were helpful to Plaintiff, they caused side effects, and she was concerned about her liver. (*Id.*) Dr. Retterath concluded that narcotic treatment was the only viable option, but Plaintiff stated that she wanted to think about it. (Tr. 543.)

On September 28, 2004, Klawitter noted that Plaintiff's mood was improved, but her somatic complaints were about the same. (Tr. 512.) Approximately one week later, Plaintiff was evaluated by Dr. Rasmussen for a cough with chest pain. (Tr. 543.) Dr. Rasmussen referred Plaintiff to a cardiologist. (*Id.*) The cardiologist, Dr. Ross Collins, noted that Plaintiff's EKG was normal. (Tr. 541.) Plaintiff's Cardiolite scan showed a scar on the left ventricle, but Dr. Collins suspected it was a false positive, so he ordered an echocardiogram to rule out myocardial infarction. (*Id.*) Dr. Collins noted that if the echocardiogram was normal, he did not recommend any more workup for heart disease. (Tr. 540.)

At the end of October 2004, Klawitter noted that Plaintiff was still looking for answers about her health problems. (Tr. 509.) Plaintiff reported that fatigue still limited her day-to-day activities. (*Id.*) The next month, Plaintiff reported to Klawitter that her thoughts and concentration were more organized, but her health problems and fatigue continued. (Tr. 508.) On November 23, 2004, Klawitter noted that Plaintiff was less intense when talking about the levels of chemicals in her well water, and that she had some satisfaction from testing by officials, but Plaintiff still felt she was not hearing the whole truth. (Tr. 507.) Klawitter opined that Plaintiff's depression and anxiety had stabilized, but that her self esteem was low. (*Id.*)

On December 10, 2004, Plaintiff reported to Dr. Rasmussen that she was doing reasonably well. (Tr. 539.) She reported that she was tired but was trying

to work harder.  (*Id.*)  Dr. Rasmussen opined that Plaintiff might get some pain relief if she went off Lexapro and started Cymbalta.  (Tr. 538.)

Plaintiff saw Dr. Kerski three days later and related that her depression level depended on what was happening.  (Tr. 505.)  Plaintiff also reported continued fatigue, especially after eating.  (*Id.*)  Dr. Kerski "[p]ushed" Plaintiff to keep as active as possible.  (*Id.*)  At the end of December, Plaintiff's mood was brighter, but she reported to Klawitter that she still suffered chronic back and side pain.  (Tr. 504.)

On January 19, 2005, Klawitter noted that Plaintiff felt the authorities were addressing her concerns about water and pollutant issues.  (Tr. 503.)  Plaintiff's mood was improved, and she was trying to keep motivated and active by doing household tasks.  (*Id.*)  The next month, Klawitter noted, "[w]ater saga continues, [Plaintiff] has now learned that new tanks installed in well are contaminated." (Tr. 502.)

On March 9, 2005, Klawitter submitted an opinion letter to the Social Security Administration Office of Hearings and Appeals on Plaintiff's behalf. (Tr. 574-75.)  Klawitter opined that Plaintiff would not be able to perform full-time competitive work because of her mental-health impairments and chronic pain. (Tr. 575.)  Klawitter noted that Plaintiff repeatedly expressed frustration about pain and fatigue interfering with her day-to-day functioning, and reported disturbed sleep that forced her to rest during the day.  (Tr. 574-75.)  Klawitter commented, "Ms. Konz is being treated for depression and anxiety related to the

changes and affects (sic) of physical pain, financial strain, and unemployment. She has been consistently involved with myself for individual therapy and psychiatry since June 2004." (Tr. 575.)

Dr. Rasmussen also submitted a letter to the Social Security Administration Office of Hearings and Appeals in March 2005. (Tr. 576-77.) He listed the following impairments that would reduce Plaintiff's ability to perform full-time competitive work: pain in her lumbar and cervical spine; pain in her left knee; inability to stand for very long without back pain; and inability to work with her arms for prolonged periods of time. (Tr. 576.) Dr. Rasmussen opined that it would be very difficult for Plaintiff to stand and work six hours a day, that she could not lift, carry, push or pull twenty pounds for up to one-third of a workday, and it was unlikely that she could do repetitive work involving lifting, carrying, pushing or pulling up to ten pounds. (*Id.*) Dr. Rasmussen noted that Plaintiff would need to have a work evaluation to determine whether she could sit and stand, and use her arms, hands, and fingers up to two-thirds of the workday. (Tr. 577.) He also noted that Plaintiff fatigued easily, and based on depression and pain, it would be difficult for her to work for a long period of time. (*Id.*)

On December 29, 2005, Plaintiff underwent a psychological consultation with Dr. Philip Sarff at the request of the Social Security Administration. (Tr. 585-89.) Plaintiff reported being depressed because there were physical things that she could not do. (Tr. 586.) Plaintiff also reported waking in the night with pain and headaches, and not feeling rested after an average of nine hours in bed.

(*Id.*)  Plaintiff reported that her energy level is always low, and her self-esteem is low because she feels guilty about not working.  (Tr. 587.)  Plaintiff denied being anxious or having physical symptoms of anxiety.  (*Id.*)  Dr. Sarff noted that Plaintiff was alert and oriented, and her speech was normal and eye contact good.  (Tr. 586.)  He also noted that Plaintiff's gait and physical movements were slow.  (*Id.*)  He described Plaintiff's social skills as pleasant but reserved.  (*Id.*)  Dr. Sarff opined that based on Plaintiff's mental-status testing, her concentration was good for simple tasks but poor for demanding tasks, her memory was intact, her intellectual functioning was in the average range, but her judgment seemed poor.  (Tr. 587.)

Plaintiff reported to Dr. Sarff that she has no difficulty with personal hygiene.  (*Id.*)  She also reported that her ability to stand long enough to cook is limited.  (*Id.*)  She stated that she can do her laundry and housework, and uses a riding mower to mow her lawn, but does things in increments.  (*Id.*)  Plaintiff reported that she has trouble completing tasks because of fatigue and pain.  (*Id.*)  Plaintiff also reported that she does her grocery shopping weekly, and she can drive her own car.  (Tr. 588.)  Plaintiff described a typical day as making her bed, showering, caring for her dog and cats, watching television, napping three to four hours, making dinner, and checking her email.  (*Id.*)

Dr. Sarff diagnosed Plaintiff with major depressive disorder, moderate, and avoidant personality traits, with a GAF score of 56.  (*Id.*)  Dr. Sarff opined:

> Based on today's examination, Ms. Konz appears capable of
> understanding simple and repetitive instructions.  She will not likely
> have difficulty remembering instructions over time, as long as she
> clearly understands them and listens in the first place.  She appears
> capable of performing simple tasks with adequate persistence, but
> her pace may be slow.  Obtaining clear medical recommendations
> regarding physical limitations, especially involving lifting, bending,
> standing, and sitting would be highly recommended.  She appears to
> have adequate social skills and should be able to get along
> adequately with coworkers and supervisors on a superficial basis.
> She likely has little tolerance for conflict, however, and will not like to
> be the center of attention in a group setting.  Under stress and
> pressure, she is likely to show increased problems with
> concentration, and reduced tolerance for pain, which will adversely
> affect her frustration tolerance and persistence.

(Tr. 589.)

On January 21, 2006, in the context of representing Plaintiff in her Social Security disability appeal, Plaintiff's counsel asked Dr. Rasmussen to provide his opinion on whether it was reasonably likely that Plaintiff's cervical-spine impairments, as documented by MRI, was the cause of her upper-extremity impairments.  (Tr. 591-92.)  On February 3, 2006, Dr. Rasmussen responded via letter, opining that he believed Plaintiff's "broad based disc bulging compromise[ed] the neural foramina and [resulted] in [Plaintiff's] upper extremity discomfort."  (Tr. 590.)  Dr. Rasmussen also opined that the numbness in Plaintiff's upper extremities would be exacerbated with repetitive use, which would result in ongoing pain, discomfort, and numbness.  (*Id.*)  He concluded this would make it unlikely that Plaintiff could have performed full-time competitive work that required her to reach, handle, and finger objects up to two-thirds of the workday.  (Tr. 590-92.)

### III.  Testimony at the Administrative Hearing

After the Appeals Council vacated the first unfavorable decision on Plaintiff's August 2003 application for benefits, a second administrative hearing was held on November 29, 2006.  (Tr. 722-98.)  The ALJ noted at the beginning of the hearing that the issue on remand was whether Plaintiff was disabled between her amended onset date of May 1, 2003, and August 11, 2005. (Tr. 724.)

#### Plaintiff's Testimony

Plaintiff testified that she was 56-years-old and lived alone in a house on ten acres of land.  (Tr. 729.)  She testified that she used to keep sheep on her land but had not for four years because she could no longer care for them. (Tr. 729-30.)  She stated that other people bring sheep on her land in the summer so she does not have to mow the grass.  (Tr. 730.)

Plaintiff testified that she finished high school and went to vocational school from 2001-2003, where she studied computer repair.  (*Id.*)  Plaintiff stated that she graduated in May 2003, with close to a 4.0 grade point average. (Tr. 731.)  Plaintiff also testified that for the last three years she has had trouble with concentration and spelling.  (Tr. 732.)  She explained that she believed she was disabled between May 2003 and August 2005, because she could not walk, she had trouble with her neck and back, her arm would go numb, and her knees would swell up.  (Tr. 733.)  Plaintiff testified that she was on a number of medications before August 2005, including Prednisone, Nortriptyline, Vioxx,

Zoloft, and Lexapro. (Tr. 736.) Plaintiff also testified that between May 2003 and August 2005, she could lift and carry ten pounds, could sit for thirty minutes but would have to get up and walk around, and could walk a couple of blocks. (Tr. 737-38.)

The ALJ then asked Plaintiff if, between 2003 and 2005, she could have done her past relevant work as a coach in a workshop. (Tr. 738.) Plaintiff testified that she could not because it required heavy lifting and other physical work. (Tr. 738-39.) Plaintiff also testified that she cooked and worked as a manager in a deli in 1990-1991, and that she could not have done the managerial part of the job before August 2005, because she did not have adequate concentration. (Tr. 739-40.) Plaintiff also stated that between May 2003 and August 2005, she could not have done her past secretarial work because she could not sit and lean over. (Tr. 741.) And she testified that she could not perform her past work as an office assistant at a school during the relevant time period because she could not stand on patrol. In addition, she explained that she could not do the office part of the job because with her neck and back problems she could not bend over a computer. (Tr. 741-42.) Plaintiff also testified that her poor concentration and pain would have prevented her from working after she received her computer-support-services degree. (Tr. 749.)

Plaintiff testified that on an average day she gets up at 9:30 a.m., stretches her back, lets her dog out, feeds her cats, showers, has lunch, and then naps until 5:00 p.m. (Tr. 745.) Plaintiff also testified that things were about the same

30

in 2005.  (*Id.*)  In addition, Plaintiff stated that she emails her son on her computer, and sometimes plays games to pass the time, but she does not "surf the net."  (Tr. 746.)  Plaintiff testified that she still goes to counseling every two weeks, she does her own housework, and she mows her lawn in increments.  (Tr. 746-47.)  She stated that a neighbor does her snow removal, and she has not had a garden for three or four years.  (Tr. 747.)

Plaintiff testified that she visited her son in Texas for a couple days in August 2006, and went to her son's wedding in "the Cities" in October 2006.  (Tr. 747-48.)  She stated that she had a few friends who she sees every couple of months, and that she goes grocery shopping once a week.  (Tr. 750.)  Plaintiff also testified that she stopped going to church in the last year because she could not sit there.  (*Id.*)

Plaintiff's attorney then questioned Plaintiff about going to vocational school.  (Tr. 751.)  Plaintiff testified that classes lasted from two to four hours a day, four days a week.  (*Id.*)  She stated that she had a tutor at the end of the program for help with algebra because of her problems with sight and concentration.  (Tr. 752.)  She also stated that she did a 180-hour internship at a courthouse taking inventory of computers over the summer, and that she had flexible hours to do the work.  (Tr. 753-54.)

Plaintiff explained that she now could not work using her hands because her fingers swell and do not work, and that if she tries she usually has to lie down and take a pain pill because of her neck.  (Tr. 761.)  Plaintiff testified that she

takes generic Darvocet for pain in her neck, shoulders, and for headaches. (Tr. 762.)  She also testified that she could work no more than thirty minutes even if she could sit or stand as needed.  (Tr. 764-65.)

Plaintiff's attorney did not question Plaintiff about how depression affects her because she testified about that at the March 28, 2005 hearing.  (Tr. 760-61.) At that earlier hearing, Plaintiff testified that her depression began when she was in vocational school and was having medical problems and fatigue.  (Tr. 684.) She testified that she treated her depression with a psychiatrist and a counselor , and that she took Lexapro.  (Tr. 684-85.)  She also testified that her depression caused memory loss.  (Tr. 687.)

### Psychological Expert Testimony

Psychologist Michael J. McGrath testified at the November 29, 2006 administrative hearing as an expert witness.  (Tr. 766.)  Dr. McGrath testified that Plaintiff had an affective disorder during the period of May 2003 through August 2005.  (Tr. 767.)  Dr. McGrath also testified that although Dr. Kerski diagnosed major depression, single episode, that was probably an overstatement because Plaintiff's social worker diagnosed her with adjustment disorder, a less serious level of depression, and Plaintiff scored within normal limits on the Beck Depression Inventory on another occasion.  (Tr. 767-68.)  In addition, Dr. McGrath testified that Plaintiff's psychological impairment would cause mild restrictions in activities of daily living, mild restrictions in social functioning, and mild restrictions in concentration, persistence or pace.  (Tr. 768.)

**Vocational Expert Testimony**

Dr. William B. Tucker testified at the November 29, 2006 administrative hearing as a vocational expert. (Tr. 783.) The ALJ asked Dr. Tucker a hypothetical question regarding whether Plaintiff could have performed any of her past relevant work in the period from May 2003 through August 2005, based on Plaintiff's testimony. (Tr. 786.) Dr. Tucker testified she could not perform any of her past jobs or any jobs he could identify, based on her testimony. (*Id.*) The ALJ posed a second hypothetical question, asking Dr. Tucker to assume an individual of Plaintiff's age, education, past work experience, with a non-severe mental impairment as described by Dr. McGrath, and who is limited to medium exertional level work. (*Id.*) Dr. Tucker testified that such a person could perform Plaintiff's past work. (Tr. 787-88.)

For a third hypothetical question, the ALJ asked Dr. Tucker to assume a person with a non-severe impairment of depression, and the ability to perform sedentary work with lifting and carrying up to ten pounds occasionally, standing or walking two hours in an eight-hour workday, and sitting for six hours in an eight-hour workday, with normal breaks. (Tr. 787.) Dr. Tucker testified that such a person could perform the job of user support analyst and sedentary receptionist. (*Id.*) Dr. Tucker also testified that there are 37,000 sedentary receptionist jobs in the region and thousands of user support analyst jobs nationally. (Tr. 787-88.) Plaintiff's attorney then questioned Dr. Tucker whether Plaintiff actually had past relevant work as a receptionist, and whether Plaintiff's

vocational training would have qualified her to perform the job of user support analyst. (Tr. 789-96.) Dr. Tucker responded that "a receptionist" was the closest to what Plaintiff described as the work she performed at the insurance office, but that she also performed duties beyond that of a receptionist. (Tr. 789.) Dr. Tucker also stated that he thought that Plaintiff could have gone directly from her training to user support analyst with no additional training. (Tr. 793.)

## IV.    The ALJ's Findings and Decision

On September 7, 2007, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act at any time between May 1, 2003 and August 13, 2005, and therefore denying Plaintiff's application for disability insurance benefits. (Tr. 16-46.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to

prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 1, 2003, therefore meeting the requirement at the first step of the disability determination procedure. (Tr. 45.) At steps two and three, the ALJ found that Plaintiff had severe impairments of multi-level degenerative disc disease of the cervical and lumbosacral spine, but that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform "work-related activities except for work involving lifting/carrying greater than 50 pounds occasionally and greater than 25 pounds frequently." (*Id.*) In reaching this RFC determination, the ALJ concluded that Plaintiff's testimony about pain, fatigue, memory deficits, and depressive symptoms prior to August 2005, was not supported by the record as a whole. (*Id.*)

At step four of the disability determination procedure, the ALJ found that from May 1, 2003, to August 13, 2005, Plaintiff retained the RFC to perform her past relevant work as an electronics assembler, electronics inspector, and resident care aide. (*Id.*) Thus, the ALJ denied Plaintiff's application for disability benefits. (Tr. 46.)

## DISCUSSION

## I.   Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits and supplemental security income under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th

Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges four errors in the ALJ's evaluation of her disability claim. First, Plaintiff alleges the ALJ's "findings are contrary to the best evidence." Second, she alleges the ALJ erred in evaluating the various physicians' opinions. Third, she alleges the ALJ erred by failing to consider the effects of her obesity. Fourth, she alleges the vocational expert's testimony is not substantial evidence supporting the ALJ's decision. This Court will address each of Plaintiff's arguments in turn.

### A.    Evidence of Residual Functional Capacity

Plaintiff contends the evidence in the record does not support the ALJ's RFC finding that Plaintiff could perform medium exertional level work between May 1, 2003, and August 13, 2005. Plaintiff urges this Court to consider that the two ALJs who reviewed her claim drew radically different conclusions about her impairments based on the same record. Therefore, Plaintiff concludes that increased scrutiny is necessary in this case. However, there is no legal precedent for increased scrutiny in such situations. *See Poppa v. Astrue*, 569

F.3d 1167, 1170 (10th Cir. 2009) (rejecting the claim that res judicata or law-of-the-case doctrine applied when first ALJ's decision was not a final decision of the Commissioner). Instead, the Court must employ the substantial evidence standard for judicial review set forth in 42 U.S.C. § 405(g), which applies only to the final decision of the Commissioner. Therefore, this Court will not consider the differences between the vacated (thus, not final) August 5, 2005 decision on Plaintiff's claim and the September 7, 2007 final decision on Plaintiff's same claim.

Next, Plaintiff contends that the ALJ ignored objective evidence of her spinal and knee impairments—specifically, a July 22, 2004 MRI of her cervical spine and a May 23, 2003 MRI of her left knee. Plaintiff contends the ALJ's finding that she can perform medium exertional level work is inconsistent with the results from these MRIs.

First, this Court notes that the ALJ reviewed the findings from Plaintiff's May 2003 and July 2004 MRI scans. (Tr. 26, 28-29.) Second, it is not the province of this Court on judicial review to make the factual finding urged by Plaintiff that her MRI results are inconsistent with the ability to perform medium exertional level work. *See Beasley v. Califano*, 608 F.2d 1162, 1166 (8th Cir. 1979) (noting that where there are conflicts in the evidence, the resolution of those conflicts are the province of the Commissioner and not the courts.) The Court will, however, consider whether the ALJ properly analyzed

Dr. Rasmussen's opinion that Plaintiff's pain and numbness was caused by the degeneration of her cervical spine, as demonstrated by MRI.

### B.    Evaluating the Physicians' Opinions

A physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician."  *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005).

If an ALJ determines not to grant controlling weight to a treating physician's opinion, medical opinions are further evaluated under the framework described in 20 C.F.R. § 404.1527(d).  Under such framework, the ALJ should consider the following factors in according weight to medical opinions: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion;

(5) the consistency of the opinion with the record as a whole; and (6) whether the source is also a specialist.  *Id.*

Plaintiff contends that the ALJ erred by granting greater weight to Drs. Grant and Aaron's (the Minnesota Disability Determination Services ("DDS") physicians) opinions about Plaintiff's physical RFC than to Dr. Rasmussen's opinion, as expressed in his letter dated February 3, 2006.  Plaintiff points out that the DDS physicians reviewed the record before Plaintiff had the MRI of her cervical spine on July 23, 2004.  Defendant contends the ALJ provided the following valid reasons for concluding that Dr. Rasmussen's opinion was not entitled to weight: (1) Plaintiff did not begin seeing Dr. Rasmussen until a year after her alleged onset of disability; (2) Dr. Rasmussen's opinion was conclusory; and (3) Dr. Rasmussen's opinion of disability was inconsistent with his earlier statements that Plaintiff should attend physical therapy so she could return to work.

The fact that Plaintiff did not begin seeing Dr. Rasmussen until a year after her alleged onset date sheds little light on why his opinion should be entitled to less weight than that of Drs. Grant and Aaron, who never examined Plaintiff at all.  However, whether Dr. Rasmussen's opinion was conclusory and inconsistent with his own treatment notes requires further consideration.

Dr. Rasmussen responded to a questionnaire about Plaintiff's ability to perform full-time competitive work on March 16, 2005.  (Tr. 576-77.)  He noted that Plaintiff had pain in her lumbar and cervical spine, and her left knee.

(Tr. 576.)  He also noted that standing caused pain in Plaintiff's back, and that she had difficulty working with her arms for prolonged periods of time.  (*Id.*) Dr. Rasmussen concluded that it would be difficult for Plaintiff to stand six hours per day or work repetitively with ten to twenty pounds objects, but that she would need a work evaluation to determine whether she could sit or stand at a workstation while frequently using her arms, hands, and fingers to grasp and manipulate objects.  (Tr. 577.)  Dr. Rasmussen also opined that pain and depression would make it difficult for Plaintiff to work for a long period of time. (*Id.*)

This Court agrees with Defendant that Dr. Rasmussen's responses to the questionnaire are conclusory because Dr. Rasmussen simply repeated Plaintiff's symptoms and concluded the symptoms would make it difficult for her to work.  In fact, the only explanation that Dr. Rasmussen gave for Plaintiff's condition was to note that she fatigued easily, which he thought may be related to the fact that she was deconditioned.  (*Id.*)  Dr. Rasmussen's treatment notes indicate that he encouraged Plaintiff to work on her conditioning so she could return to work. (Tr. 545.)  He also noted that her inactivity made things worse.  (Tr. 552.)

Plaintiff's attorney later sent Dr. Rasmussen a letter, asking him to further elaborate by responding to two specific questions.  Dr. Rasmussen responded in February 2006, stating that Plaintiff's broad based disc bulging with compromise of the neural foramina caused her upper extremity discomfort and work would exacerbate her discomfort and neurological findings.  (Tr. 590.)  Although this

opinion establishes that Plaintiff has a condition that causes pain, it does not address the severity of Plaintiff's symptoms. However, Dr. Rasmussen also opined that "the patient's neurological deficits are such that the repetitive use of her upper extremities would exacerbate her problem and result in ongoing pain, discomfort, and numbness" that would make it unlikely she could perform full-time competitive employment that required her to reach, handle, and finger objects up to two-thirds of the work day. (Tr. 590-92.)

Contrary to his opinion, Dr. Rasmussen's treatment notes indicate that in December 2003, he did not see any evidence that Plaintiff had neurological problems. (Tr. 274.) And about three months later, Plaintiff had an EMG at the Mayo Clinic, and was found to have only mild carpal tunnel syndrome. (Tr. 451.) Notably, of the many evaluations Plaintiff had for her ongoing symptoms at Mayo Clinic in the spring of 2004, she was not evaluated for neck or back pain. (Tr. 424-74.) And in fact, after Plaintiff's extensive work-up at Mayo Clinic in the spring of 2004, Plaintiff expressed her desire to go back to work. (Tr. 563). In addition, in May 2004, Dr. Rasmussen diagnosed Plaintiff with mechanical low back pain, mild right carpal tunnel, and degenerative arthritis. (Tr. 562.) Dr. Rasmussen encouraged Plaintiff to increase her physical activity so she could return to work, even after Plaintiff stated she did not feel she could do so. (Tr. 552, 557-58, 562). This is inconsistent with Dr. Rasmussen's opinion of disability.

The ALJ found that Plaintiff's treatment for low back and neck pain in 2003 and 2004 was episodic rather than persistent.  (Tr. 42.)  The record supports this finding.  (Tr. 538-73.)  Further, in November 2003, Plaintiff was discharged from physical therapy for failure to attend her appointments.  (Tr. 286-87.)    And in June 2004, even though Plaintiff reported that physical therapy increased her pain, her physical therapist noted that she performed exercises well, and that she was able to sit in front of her computer at home for three or four hours and could walk to her grove to pick asparagus.  (Tr. 555.)

Plaintiff alleges Dr. Rasmussen's opinion is based on MRI scans of her cervical spine and knee from July 2004, which the DDS physicians never reviewed.  The record reflects that Plaintiff "insisted on" an MRI of her cervical spine from Dr. Salib at the Institute for Low Back and Neck Care in July 2004 because she had neck pain and arm numbness and tingling.  (Tr. 534-35.)  And Dr. Salib ". . .  assumed, based on Dr. Rasmussen's record [that Plaintiff's symptoms] ha[d] been diagnosed as carpal tunnel syndrome)."  (*Id.*)  Notably, however, when Dr. Salib reviewed the MRI of Plaintiff's cervical spine he stated, "I would recommend that [Plaintiff] be evaluated either by Dr. Sabers or Dr. Lynn in our group for neck pathology as to *whether or not* it may be in any way related to her arm numbness and tingling and chronic neck pain."  (Tr. 533 (emphasis added).)  The record does not indicate that Plaintiff was subsequently seen by Dr. Sabers or Dr. Lynn.

Although Dr. Rasmussen provided the opinions Plaintiff sought regarding her disability, the record does not reflect that Plaintiff was given any functional restrictions on her cervical spine or upper extremities after the July 2004 MRI was taken. In fact, on December 10, 2004, Dr. Rasmussen noted "[Plaintiff] has undergone a complete back evaluation. They told her basically to continue with medical management." (Tr. 539.) At that time, Plaintiff complained only of low back pain, not neck or arm pain, and also reported that she was doing reasonably well. (*Id.*) Therefore, even if Dr. Rasmussen's opinion is based on the July 2004 MRI of Plaintiff's cervical spine, his opinion is inconsistent with other evidence in the record.

With respect to Plaintiff's knee pain, the ALJ noted that Plaintiff first complained of left knee pain on November 6, 2002, but in October 2003, she acknowledged that Prednisone had helped her knee, and she was having no pain or swelling. (Tr. 29.) The ALJ noted that Plaintiff attributed her inability to stand or walk for very long to her back pain, not her knee pain. (*Id.*) Thus, the ALJ concluded that Plaintiff did not establish impairments to her knees that resulted in functional limitations that persisted for twelve months or longer, and that this is supported by the record. (*Id.*) The ALJ's decision to grant more weight to Dr. Grant and Dr. Aaron's opinions should be affirmed because the ALJ provided appropriate reasons for rejecting Dr. Rasmussen's opinion—the inconsistency with Dr. Rasmussen's prior treatment notes and inconsistency with other evidence in the record. *See Hamilton v. Astrue*, 518 F.3d 607, 610-12 (8th

Cir. 2009) (finding appropriate reasons for giving the treating physician's opinions less weight).

Plaintiff also contends that the ALJ erred in relying on DDS consultants in finding her mental impairment to be nonsevere. Plaintiff asserts that she did not have a formal assessment of the severity of her mental impairment by a treating or examining mental-health expert until after the DDS consultants reviewed the record and opined as to her mental RFC on March 24, 2004. Plaintiff points out that Dr. Kerski diagnosed her with major depression and assigned her a GAF score of 50 in August 2004. Plaintiff also notes that her social worker, Laurie Klawitter, also assigned her a GAF score of 50, indicating serious symptoms or serious impairment in social, occupational, or school functioning. And although it was after the relevant time period, Plaintiff notes that in December 2005, a DDS consulting examiner, Dr. Sarff, found her to have a severe mental impairment.

In addition, Plaintiff contests the testimony of Dr. McGrath, the psychologist who testified as a medical expert at the November 29, 2006 administrative hearing. Plaintiff notes that in disagreeing with Dr. Kerski's diagnosis of major depression, Dr. McGrath relied on the fact that Plaintiff scored within normal limits on a Beck Depression Inventory at Mayo Clinic. Plaintiff asserts the Beck Depression Inventory does not provide a good longitudinal view of Plaintiff's impairment, and points out that she was diagnosed with depression at Mayo Clinic. Defendant, on the other hand, contends that the ALJ was entitled to rely on Dr. McGrath's testimony, which was consistent with a DDS consultant's

opinion that Plaintiff's mental impairment was not severe, and consistent with evidence from the Beck Depression Inventory, mini-mental-status examinations, and Plaintiff's average score in a neuropsychological examination.

The ALJ very thoroughly discussed all evidence of Plaintiff's mental impairment, including Plaintiff's cross-examination of Dr. McGrath and Plaintiff's testimony as it pertains to her daily activities, social functioning, and concentration, persistence, and pace. (Tr. 30-35.) The ALJ was persuaded by Dr. McGrath's testimony that the Beck Depression Inventory, which indicated that Plaintiff's mood fell within a normal range, was a more reliable and objective indication of the severity of Plaintiff's depression than her GAF scores, which indicated that she had severe symptoms. (Tr. 33.) The ALJ also found the GAF scores inconsistent with other evidence in the record from the relevant time period, noting that Plaintiffs asserted onset date was at the time she completed school and graduated with a 4.0 GPA. (*Id.*) The ALJ found this to be inconsistent with more than mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace. (*Id.*)[10] For the same reasons, the ALJ rejected Klawitter's March 2005 opinion letter stating that Plaintiff's mental impairments and chronic pain would preclude her from full-time competitive employment. (Tr. 34-35.) In addition, the ALJ addressed Plaintiff's allegation of difficulties with memory. He noted that when Plaintiff complained of

_____

[10]     GAF scores may be relevant evidence, but they can be discounted if inconsistent with other evidence in the record. *See England v. Astrue*, 490 F.3d 1017, 1023 n.8 (8th Cir. 2007) (citing *Hudson ex rel Jones*, 345 F.3d at 666).

short-term memory problems, she was tested by Dr. Machulda, and her intellectual functioning and memory were in the normal range. (Tr. 35.) Further, the ALJ noted occasions during the relevant time period where Plaintiff was active keeping up her lawn and garden, looking for employment, going to a casino two nights in a row, driving to Minneapolis, sitting at a meeting for two hours, and sitting in front of her home computer for three to four hours. (Tr. 34.) The ALJ found these activities inconsistent with more than mild mental limitations.

After review of the record, this Court concludes that the ALJ's analysis was thorough and well-supported by evidence in the record. In other words, this Court concludes that there is substantial evidence in the record as a whole, and good reason for the ALJ to adopt the DDS physicians' opinions and discount Dr. Rasmussen's opinion, and therefore the Court should affirm the ALJ's decision. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (affirming ALJ's decision to grant more weight to nonexamining reviewer's opinion because the opinion was consistent with record as a whole.); *see also Woolf*, 3 F.3d at 1213 (8th Cir. 1993) (stating that the court is "not allowed to substitute [its] opinion for that of the ALJ, who enjoys a closer position to the testimony in support of an application") (citing *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (stating that a court may not reverse merely because substantial evidence would have supported an opposite decision)).

## C.    The Effects of Obesity

The regulations require that the combined effect of all of a claimant's impairments be considered in determining whether one or more impairments are of sufficient medical severity to be the basis for disability under the law.  20 C.F.R. § 404.1523.  Furthermore, Social Security Ruling 02-1p provides that the Social Security Administration will consider obesity in determining whether an individual has a severe impairment, whether an impairment meets or equals a listed impairment, and whether an individual's impairments prevent him or her from performing past relevant work or other work that exists in significant numbers in the national economy.  SSR 02-1p, 2000 WL 628049, at *3 (S.S.A. Sept. 12, 2002).

Plaintiff contends that her back and knee impairments are exacerbated by her obesity, and that the ALJ erred by failing to take that into account.  As Plaintiff points out, Dr. Grant, a DDS physician, listed obesity as one of Plaintiff's impairments, but the ALJ did not.  However, Dr. Grant also opined that Plaintiff could perform medium exertional level work, and the ALJ agreed with Dr. Grant's opinion.  Thus, the ALJ's failure to list obesity as one of Plaintiff's impairments is harmless.  *See Forte v. Barnhart*, 377 F.3d 892, 896-97 (8th Cir. 2004) (stating that where physician testified claimant could perform light work despite obesity, ALJ's failure to discuss obesity as an impairment was not fatal).

**D.    The Hypothetical Question**

Plaintiff contends that the ALJ posed a defective hypothetical question to the vocational expert by incorporating the opinions of nontreating, nonexamining medical sources regarding Plaintiff's impairments and functional limitations. However, where the ALJ's findings of Plaintiff's RFC are supported by substantial evidence, as they are here, the ALJ need only include in the hypothetical question those limitations and impairments that he found credible. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

As explained above, this Court concludes that there is substantial evidence in the record as a whole, and good reason for the ALJ to adopt the DDS physicians' opinions and to discount Dr. Rasmussen's opinion. Thus, the ALJ's hypothetical question based on the DDS physicians' opinions was proper and the vocational expert's conclusion based on that hypothetical was proper as well, and therefore, the ALJ's decision should be affirmed.[11]

---

[11]    This Court notes that, having reviewed the record, including the opinions and assessments of the various physicians and experts, it finds that there is

# RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 7), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 9), be

**GRANTED**;

3.      The decision of the Commissioner of Social Security be **AFFIRMED**;

and

4.      This case be **DISMISSED WITH PREJUDICE**.


Date: December 8, 2009                    ___*s/ Jeffrey J. Keyes*_____
                                          JEFFREY J. KEYES
                                          United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of the Court, and serving all parties by
**December 22, 2009** a writing which specifically identifies those portions of this
Report to which objections are made and the basis for those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within ten days after service thereof.  A judge shall make a
de novo determination of those portions to which objection is made.  This Report
and Recommendation does not constitute an order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.

---

substantial evidence in the record to support the Commissioner's decision
regarding Plaintiff's RFC and her ability to perform other jobs in the national
economy.  *See Cruze v Chater*, 85 F.3d 1320, 1326 (8th Cir. 1996) (finding
vocational expert's testimony which was based on a properly phrased
hypothetical question sufficient to support the ALJ's decision).